The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES EX REL. MARY MELETTE THOMAS

## DEFENDANTS

AETNA, INC., ET AL

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John T. Crutchlow
Youman & Caputo, LLC
Two Logan Square, Suite 1925

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3729(a)

Brief description of cause:
Violations of the False Claims Act (31 U.S.C. 3729, et seq.).

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE  1/24/24

SIGNATURE OF ATTORNEY OF RECORD
*John Crutchlow*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNDER SEAL, | Case No: |
| Plaintiffs, | |
| | COMPLAINT |
| v. | |
| UNDER SEAL | |
| Defendants. | |

# FILED UNDER SEAL

# DO NOT PLACE ON PACER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES EX REL. MARY MELETTE THOMAS, | Case No: |
| Plaintiffs, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| AETNA INC., a Pennsylvania corporation; | **<u>FILED UNDER SEAL</u> PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| AETNA HEALTH AND LIFE INSURANCE CO., a Connecticut corporation; | |

AETNA LIFE INSURANCE CO., a Connecticut corporation;
AETNA BETTER HEALTH OF CALIFORNIA, INC., a California corporation;
AETNA HEALTH OF CALIFORNIA, INC.; a California corporation;
AETNA HEALTH INC. (CT), a Connecticut corporation;
AETNA HEALTH INC. (FL), a Florida corporation;
AETNA BETTER HEALTH, INC. (Ga), a Georgia corporation;
AETNA HEALTH INC. (GA), a Georgia corporation;
AETNA Better Health of Illinois (IL), an Illinois corporation;
AETNA HEALTH OF IOWA, INC., an Iowa corporation;
AETNA BETTER HEALTH OF KANSAS, INC., a Kansas corporation;
AETNA BETTER HEALTH, INC. (LA), a Louisiana corporation;
AETNA HEALTH INC. (LA), a Louisiana corporation;
AETNA HEALTH INC. (ME), a Maine corporation;
AETNA BETTER HEALTH OF MICHIGAN, INC., a Michigan corporation;
AETNA HEALTH OF MICHIGAN, INC., a Michigan corporation;

AETNA BETTER HEALTH, INC.
(NJ), a New Jersey corporation;
AETNA HEALTH INC. (NJ), a New
Jersey corporation;
AETNA HEALTH INC. (NY), a New
York corporation;
AETNA BETTER HEALTH OF
OKLAHOMA, INC., an Oklahoma
corporation;
AETNA BETTER HEALTH, INC.
(OH), an Ohio corporation;
AETNA HEALTH OF OHIO, INC., an
Ohio corporation;
AETNA HEALTH INC. (PA), a
Pennsylvania corporation;
AETNA HealthAssurance
Pennsylvania, a Pennsylvania
corporation;
AETNA BETTER HEALTH OF
TEXAS, INC., a Texas corporation;
AETNA HEALTH INC. (TX), a Texas
corporation;
AETNA HEALTH OF UTAH, INC., a
Utah corporation; and
AETNA BETTER HEALTH OF
WASHINGTON, INC., a Washington
corporation,

          Defendants.

Table of Contents

I.      Introduction ..........................................................................................4

II.     The Parties ...........................................................................................6

        A.      Plaintiff ......................................................................................6

        B.      Defendants .................................................................................7

III.    Jurisdiction and Venue ........................................................................10

IV.     Background and Applicable Law ...........................................................11

        A.      The False Claims Act ..................................................................11

        B.      The Medicare Program ...............................................................12

                1.      Medicare Advantage Program ...........................................13

                2.      Medicare Risk Adjustment ................................................13

                3.      Certifications of Data Related to Payment.........................15

        C.      Morbid Obesity ..........................................................................15

        D.      The Role of Aetna Coding Auditors .............................................16

V.      Allegations ..........................................................................................19

        A.      Aetna Submitted to CMS Diagnosis Codes for Morbid Obesity
                That Were False, Inaccurate, or Otherwise Invalid, Causing
                Beneficiaries to Appear Sicker Than They Were and Increasing
                Their Risk Scores and CMS Payments to Aetna ............................19

                1.      Prior to 2019 Aetna Required Coders to Substantiate a
                        Diagnosis of Morbid Obesity if BMI Was Less than 40 ...20

                2.      Starting in 2019 Aetna Directed Coders to Look Only One
                        Way When Reviewing Diagnoses of Morbid Obesity.......21

                        a.      Aetna's 2019 Coding Guide Removed the Directive
                                to Substantiate a Diagnosis of Morbid Obesity if
                                BMI was Less Than 40 and Aetna Coders Were
                                Directed to Code Morbid Obesity *Regardless* of
                                BMI...................................................................21

                        b.      Aetna's 2019 Guide Was Updated to Provide that
                                BMI of 40 or Greater Could be Used to *Substantiate*
                                a Diagnosis of Morbid Obesity Where The
                                Documentation Conflicted....................................24

                        c.      After 2019 Aetna Continued to Direct Coders to
                                Validate a Diagnosis of Morbid Obesity *Regardless*
                                of Conflicting BMI Information ............................24

        B.      Defendants Acted Knowingly.......................................................26

        C.      The Misrepresentations Were Material..........................................26

VI.     Causes of Action .................................................................................27

Qui Tam Plaintiff and Relator Mary Melette Thomas ("Relator") through her attorneys Phillips and Cohen LLP and Youman and Caputo LLC, on behalf of the United States of America brings this Complaint against Aetna Inc. and its affiliated entities providing Medicare Advantage Plans under Medicare Part C and alleges based upon personal knowledge, information, and belief, as follows:

## I.    <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*. (the "FCA"). Through this action, Relator seeks to redress the fraud Defendants have perpetrated on the Medicare program by knowingly and systematically submitting diagnosis codes for morbid obesity that were false, inaccurate, or otherwise invalid.

2.      The Medicare Advantage Program under Medicare Part C relies on private entities, known as Medicare Advantage Organizations ("MA Organizations") to provide healthcare coverage for eligible individuals who enroll in Medicare Advantage Plans in lieu of traditional Medicare fee-for-service benefits.  The program pays MA Organizations a set or "capitated" amount for each individual enrolled in an MA Organization's Plan ("enrollee" or "beneficiary") offered by the MA Organization based on the expected cost of coverage for that beneficiary given their demographics such as age and gender.  That amount is annually "risk-adjusted" for the health status of the individual as reported to CMS using diagnoses drawn from the enrollee's medical records submitted to the MA Organization by the enrollee's healthcare providers.  As a result of this risk adjustment, the Part C program pays more for beneficiaries who are likely to incur higher healthcare costs, and less for beneficiaries who are not likely to incur high costs.  This provides a powerful financial incentive for MA Organizations to represent beneficiaries as sicker than they are.

3.      Obesity is a chronic disease that is characterized by excess body fat. While excess body fat itself is not a disease, over time, it is associated with significant health problems including heart disease, diabetes, certain cancers, and reduction in the length of life.  Obesity is evaluated on a spectrum ranging from mild to moderate to severe.  *Morbid* obesity is the most severe type of obesity.  In the United States, one out of every three adults are obese; one out of every ten adults are morbidly obese.  People with morbid obesity are likely to require more medical treatment and incur higher medical costs.

4.      The diagnosis of morbid obesity must be made by a physician or other provider.  One of the primary objective tools used to make the diagnosis of morbid obesity is the Body Mass Index (BMI).  BMI is a measure of body fat based on height, weight, and gender and is a useful gauge of obesity.

https://www.nhlbi.nih.gov/health/educational/lose_wt/.

5.      Under Medicare Part C, the diagnosis of morbid obesity has a significant financial impact on Medicare.  The submission to CMS of the diagnosis code for morbid obesity alone triggers a higher monthly payment to an MA Organization for that individual, regardless of whether any related treatment was provided.

6.      The government is dependent upon MA Organizations to accurately represent the health status of beneficiaries, including submitting accurate diagnosis codes, auditing records to ensure accuracy, and correcting previously submitted inaccurate diagnosis codes.  Although MA Organizations have patient medical records that they can use to validate diagnosis codes, the government does not have those records, which are not submitted to CMS.

7.      When the patient's medical record contains conflicting information about a diagnosis — for example, a physician charts that a patient is morbidly obese, but the BMI indicates otherwise — the diagnosis may not be accurate.  The MA Organization

COMPLAINT

must reconcile conflicting medical information to ensure the accuracy of the diagnosis codes it submits to CMS.

8.      As more fully described below, Aetna submitted morbid obesity diagnosis codes to CMS when BMI values indicated the patients were, in fact, not morbidly obese. Aetna not only eliminated the internal process of reconciling conflicting medical information — the very process which was designed to ensure that morbid obesity diagnosis code are accurate — but also specifically directed coders to ignore conflicting information.  This was financially significant for Aetna and for the government.  By falsely representing that beneficiaries were morbidly obese when they were not, Aetna caused the government unwittingly to pay Aetna more for the care of these beneficiaries than it would have if Aetna had truthfully represented their health status.

9.      Aetna's conduct flies in the face of an MA Organization's statutory, regulatory and contractual obligations to determine that a diagnosis is supported by the medical record, to attest to the accuracy of the data it submits to the government, and to have a compliance program designed to identify and correct invalid diagnoses.

10.     In addition to abusing the basic tenets of the Medicare Advantage Program, Aetna's conduct violated the FCA by seeking payment that Aetna knew it was not entitled to, submitting false records and statements to support its false claims for payment, and failing to return overpayments.  Through this action, Relator seeks to recover, on behalf of the United States, treble damages and civil penalties under the FCA for each violation.

## II.      **THE PARTIES**

### A.      **Plaintiff**

11.     Relator Mary Melette Thomas is a resident of Arizona and a Certified Risk Coder ("CRC") and a Certified Risk Adjustment Coder ("CRAC").  She is currently employed as a Student Success Manager by the American Association of Professional Coders ("AAPC"), which is one of the two main accrediting organizations for

professional coders.  Her job responsibilities for AAPC include managing a team of teaching assistants and student support staff as part of a program to help students through the certification process.  She has held that position since February 2023.

12.    From September 2019 to October 2022, Relator was a risk adjustment coding auditor for Aetna.  As a member of the Senior Quality Auditing Team, she was responsible for the second level of retrospective review of diagnosis codes submitted to Medicare and Medicaid Services ("CMS") by Aetna Plans to support payment under Medicare Part C.  Relator was based in Arizona, but she and her team reviewed diagnoses and medical records submitted for providers nationwide for all Aetna Plans.

13.    Prior to her employment with Aetna, Relator worked for Evolent Health from April 2017 to September 2019 as a risk adjustment coding educator.

### B.    **Defendants**

14.    Defendant Aetna Inc. is an insurance company, incorporated in Pennsylvania, and the direct or indirect parent company of all the Aetna MA Organization defendants in this action (collectively "Aetna" or "Defendants").  In 2018, Aetna Inc., was purchased by CVS Health Corporation and is a wholly owned subsidiary of CVS Health.

15.    Aetna operates Medicare Advantage Plans throughout the country and has offices in various locations, including in the Eastern District of Pennsylvania.  Aetna contracts with CMS to provide Medicare Advantage Plans to eligible individuals.  Aetna had close to three million enrollees in its Plans in 2023.

16.    The Defendants include all the MA Organizations controlled directly or indirectly by Aetna Inc., each of which had one or more contracts with CMS to provide a Plan during the period 2019 to the present.  These Plans are generally marketed as "Aetna Medicare," or with locally relevant names such as "Aetna Better Health of Ohio, and include:

(a)    Aetna Better Health of California, Inc., incorporated in California and marketing its Plans as Aetna Medicare;

(b)    Aetna Health of California, Inc.; incorporated in California and marketing its Plans as Aetna Medicare;

(c)    Aetna Health Inc. (CT), incorporated in Connecticut and marketing its Plans as Aetna Medicare;

(d)    Aetna Health and Life Insurance Co., incorporated in Connecticut and marketing its Plans as Aetna Medicare;

(e)    Aetna Life Insurance Co., incorporated in Connecticut and marketing its Plans as Aetna Medicare;

(f)    Aetna Health Inc. (FL), incorporated in Florida and marketing its Plans as Aetna Medicare;

(g)    Aetna Better Health, Inc. (Ga), incorporated in Georgia and marketing its Plans as Aetna Medicare;

(h)    Aetna Health Inc. (GA), incorporated in Georgia and marketing its Plans as Aetna Medicare;

(i)    Aetna Health of Iowa, Inc., incorporated in Iowa and marketing its Plans as Aetna Medicare;

(j)    Aetna Better Health of Kansas, Inc., incorporated in Kansas and marketing its Plans as Aetna Medicare;

(k)    Aetna Better Health, Inc. (LA), incorporated in Louisiana and marketing its Plans as Aetna Medicare;

(l)    Aetna Health Inc. (LA), incorporated in Louisiana and marketing its Plans as Aetna Medicare;

(m)    Aetna Health Inc. (ME), incorporated in Maine and marketing its Plans as Aetna Medicare;

(n)     Aetna Better Health of Michigan, Inc., incorporated in Michigan and marketing its Plans as Aetna Medicare and Aetna Better Health Premier Plan;

(o)     Aetna Health of Michigan, Inc., incorporated in Michigan and marketing its Plans as Aetna Medicare;

(p)     Aetna Better Health, Inc. (NJ), incorporated in New Jersey and marketing its Plans as Aetna Better Health of New Jersey;

(q)     Aetna Health Inc. (NJ), incorporated in New Jersey and marketing its Plans as Aetna Medicare;

(r)     Aetna Health Inc. (NY), incorporated in New York and marketing its Plans as Aetna Medicare

(s)     Aetna Better Health of Oklahoma, Inc., incorporated in Oklahoma and marketing its Plans as Aetna Medicare;

(t)     Aetna Better Health, Inc. (OH), incorporated in Ohio and marketing its Plans as Aetna Better Health of Ohio and MyCare Ohio;

(u)     Aetna Health of Ohio, Inc., incorporated in Ohio and marketing its Plans as Aetna Medicare;

(v)     Aetna Health Inc. (PA), incorporated in Pennsylvania and marketing its Plans as Aetna Medicare;

(w)     Aetna HealthAssurance Pennsylvania, incorporated in Pennsylvania and marketing its Plans as Aetna Medicare.

(x)     Aetna Better Health of Texas, Inc., incorporated in Texas and marketing its Plans as Aetna Medicare;

(y)     Aetna Health Inc. (TX), incorporated in Texas and marketing its Plans as Aetna Medicare;

(z)     Aetna Health of Utah, incorporated in Utah and marketing its Plans as Aetna Medicare; and

(aa)    Aetna Better Health of Washington, Inc., incorporated in Washington and marketing its Plans as Aetna Medicare.

## III.    <u>JURISDICTION AND VENUE</u>

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

18.    Although the issue is no longer jurisdictional, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4).  Moreover, Relator would qualify under that section as an "original source" of the information even had such a public disclosure occurred, as she has direct and independent information that would materially add to any publicly disclosed allegations or transactions of fraud and she voluntarily provided her information to the government before filing this action.

19.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants have minimum contacts with the United States.  Moreover, Aetna Inc. is incorporated in this State and thus at least one Defendant can be found, resides, and/or transacts or has transacted business in this District.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because at least one Defendant can be found in and/or transacts or has transacted business in this District.  At all times relevant to this Complaint, at least one Defendant regularly conducted substantial business in this District, and statutory violations, as alleged in this Complaint, occurred in this District.

IV.    **BACKGROUND AND APPLICABLE LAW**

A.    **The False Claims Act**

21.    The FCA was originally enacted during the Civil War, substantially amended in 1986, and amended again in 2009 and 2010.  Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

22.    The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. §§ 3729(a)(1)(A), (B).  The FCA also prohibits knowingly concealing or avoiding an obligation to return overpayments.  31 U.S.C. § 3729(a)(1)(G).

23.    A false or fraudulent claim under the FCA may take many forms, "the most common being a claim for payment for goods and services not provided, or provided in violation of contract terms, specification, statute, or regulation."  False Claims Amendments Act of 1986, S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.  The terms "false or fraudulent" have the same meaning as under the common law and extend to misrepresentations by omission as well as express false representations.

24.    The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance.  31 U.S.C. § 3729(b)(1)(A).  No specific intent to defraud need be shown.  31 U.S.C. § 3729(b)(1)(B).

25.     The misrepresentation must be material, which the FCA defines as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

26.     The False Claims Act provides that a person who violates the Act is subject to three times the damage to the United States caused by the violation, as well as statutory penalties.  31 U.S.C. § 3729(a)(1).

27.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  Such a person is known as a *qui tam* "relator."  The FCA requires that the *qui tam* relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

### B.     <u>The Medicare Program</u>

28.     Medicare is a federally funded health-insurance program primarily benefitting the elderly.  Congress established the Medicare program in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or older.  In addition to the elderly, a large portion of Medicare's patient population is disabled.  The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

29.     Medicare has four parts:  Part A, providing insurance for hospital care; Part B, providing insurance for outpatient care; Part C, also known as "Medicare Advantage," which provides insurance for hospital and outpatient care via managed care plans sponsored by private insurance companies; and Part D, which provides prescription drug benefits.  The claims at issue in the case involve Part C.

1.      **Medicare Advantage Program**

30.     Under Part C, individuals who are eligible for Medicare may enroll in a private healthcare plan instead of the traditional fee-for-service Medicare.  CMS contracts with private health insurers ("MA Organizations"), which contract with healthcare providers to provide services to the beneficiaries enrolled in the health insurer's Medicare Advantage plans ("MA Plans"), which are packages of health insurance benefits and prescription drug plans ("PD Plans"), which are packages of prescription medications, all of which are hereafter referred to as "Plans."

31.     MA Organizations are "risk-bearing" entities that must be licensed by the State in which they are located.  42 C.F.R. §§ 422.2 & 422.503(b)(2).

2.      **Medicare Risk Adjustment**

32.     CMS makes advance payments each month to an MA Organization for the expected costs of providing benefits to persons enrolled in the MA Organization's Plans. 42 C.F.R. § 422.304.  These amounts are capitated and not adjusted to reflect the actual costs of providing care to individuals in the plan.

33.     CMS payments to an MA Organization are for the anticipated cost of providing care to the individuals in their Plans.  42 C.F.R. § 422.308(c); 42 U.S.C. § 1395w-23(a)(1)(C).  CMS then adjusts these base costs using "risk scores" that take into account the demographic characteristics, such as age and gender, and the health status of each person enrolled in the plan.  A risk score is a measure that reflects the additional or reduced costs that each enrollee is expected to incur compared to the average enrollee.  As a result, the government pays an MA Organization more for beneficiaries with more serious chronic medical conditions who have a higher risk score than for healthier beneficiaries with lower risk scores.

34.     To determine an enrollee's health status, CMS uses data that MA Organizations submit, in accordance with CMS instructions, that provides the context and

purpose of each item and service provided to an individual beneficiary.  42 C.F.R.

§ 422.310(b).  MA Organizations submit the data through CMS's Risk Adjustment

Processing System ("RAPS").  Each submission is a claim for payment and also a record

in support of a claim for payment.

35.     The MA Organization must obtain the data from the physician or other

provider who furnished the item or service to the beneficiary and must conform the

submitted data to the equivalent data used for Medicare fee-for-service, and where

appropriate, relevant national standards.  42 C.F.R. § 422.310(d).

36.     CMS requires diagnoses to be coded according to the International

Classification of Diseases, now in its 10th release (ICD-10), which identifies particular

diagnoses.  Pub. 100-16, Medicare Managed Care Manual ("MCM Manual"), Chapter 7.

"Diagnosis codes drive the risk scores, which drive the risk adjusted reimbursement from

CMS to MA Organizations."  *Id.,* Chapter 7, § 120.2.3.

37.     CMS maps the diagnosis codes with similar characteristics, severity, and

cost into hierarchical condition categories (HCCs).  42 C.F.R. § 422.2.  Each HCC has a

numerical value assigned to it that is used in calculating an individual's risk score.

Higher values are assigned to HCCs that involve greater severity of disease and greater

costs associated with treatment.  A single diagnosis may map to more than one HCC, but

CMS will use only the most severe HCC in determining the individual's risk score.

38.     The risk adjustment process is prospective in that an individual's diagnosis

codes for one calendar year are used to set the risk score for the following payment year.

42 C.F.R. § 422.310(g).

39.     If the medical records for an individual do not support the diagnosis codes

submitted to CMS, the risk score for an individual will be incorrect and CMS will

overpay the MA organization.  Depending on the cost implications of a particular

diagnosis, the overpayment could be substantial.

### 3.  Certifications of Data Related to Payment

40.    MA organizations must agree to follow CMS regulations and instructions, and such compliance is material to the performance of the contract.  42 C.F.R. § 422.504(a).  CMS requires that all submitted diagnosis codes be documented in the medical record.  MCM Manual, Chapter 7, § 40.

41.    MA organizations are responsible for certifying the "accuracy, completeness, and truthfulness of the data" submitted to CMS for payment purposes.  42 C.F.R. § 422.504(*l*) and 42 C.F.R. § 422.310(d)(1).  Each year an MA Organization must agree in writing that:

> As a condition for receiving a monthly payment … the MA organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests.

42 C.F.R. 422.504(*l*); MCM Manual, Chapter 11, § 130.

42.    MA Organizations are required to monitor the data that they receive from providers and submit to CMS, and must adopt and implement an effective compliance program which includes measures to prevent, detect, and correct noncompliance with program requirements.  They must also establish and implement an effective system for routine monitoring and identification of compliance risks.  42 C.F.R. § 422.503(b)(4)(vi).

43.    MA Organizations are also required to delete previously submitted diagnosis codes that they determine to be invalid or to otherwise return risk adjustment payments based on invalid diagnoses.  MCM Manual, Chapter 7, § 40.

### C.  Morbid Obesity

44.    The ICD 10 Code for morbid (severe) obesity due to excess calories is E66.01.

45.    The medical records for individuals diagnosed as morbidly obese typically include one or more recordings of body mass index (BMI), which measures body fat based on weight and height.

46.    National standards make clear that individuals with a BMI below 35 cannot properly be diagnosed as morbidly obese:

- The National Coverage Determination ("NCD") Manual classifies severe obesity as 35 or greater for purposes of determining the medical necessity of bariatric surgery. Bariatric Surgery for Treatment of Morbid Obesity, NCD Manual, Pub. No. 100-3, Section 100.1.

- Guidelines from the Center for Disease Control and Prevention (CDC) define a healthy BMI range as 18.5 to 24.9, overweight as 25 to 29.9, obese as over 30, and severe obesity as a BMI of 35 or higher. https://www.cdc.gov/obesity/basics/adult-defining.html.

- The National Heart, Lung & Blood Institute (NHLB) 1998 guidelines classified BMI from 25-29.9 as overweight, from 30-34.9 as Class 1 obesity, 35 to 39.9 as Class II obesity, and 40 or greater as Class III extreme obesity. Management of Overweight and Obesity in Adults:  Systematic Evidence Review From the Obesity Expert Panel, 2013, at 5, available at https://www.nhlbi.nih.gov/sites/default/files/media/docs/obesity-evidence-review.pdf.

47.    A diagnosis of E66.01 will map to a number of HCC codes that correlate with conditions associated with severe obesity and will increase an individual's risk score.

**D.    The Role of Aetna Coding Auditors**

48.    Each and every medical diagnosis rendered—at a physician's office, a hospital, a clinic or other facility—must be assigned the appropriate diagnosis code.  If the patient is an enrollee or member of an MA Plan, the MA Plan obtains the diagnosis codes from the provider.  The MA Plan submits the diagnosis codes to CMS, representing that the codes are accurate based on best knowledge, information, and belief.

49.     MA Organizations, like Aetna, routinely audit the diagnosis codes retrospectively to ensure that the codes submitted are accurate and to correct them when they are not as required by statute, regulation, and contract.

50.     Aetna established an audit team and an audit system for this purpose.  The audit team was comprised of about 30 qualified coders and auditors as explained below. This team, which worked remotely from different parts of the country and had nationwide responsibility, audited diagnosis codes that had been submitted to CMS the previous year.

51.     Aetna's audit system required the audit team to review the medical chart from the physician or other provider to validate or invalidate the diagnosis that had previously been submitted to CMS.  The Relator was a senior auditor on this team.

52.     During the time Relator was employed there, Aetna had three levels of retrospective review of diagnosis codes that had been submitted to CMS by its Plans in the prior year.  These levels were a first pass audit, a second pass audit, and a third pass audit, with each team consisting of 10 auditors and one manager.  All the auditors were Certified Professional Coders ("CPC").

53.     The Relator was a second pass auditor.  To be a member of this senior audit team, the auditor had to be a Certified Risk Adjustment Coder in addition to being a CPC.  The task of this team was to review 100 percent of the decisions of the first pass auditors.  The team would receive a batch of charts, which could be from any Aetna Plans anywhere in the country, but which would typically involve the same providers and focus on a particular trend, such as diabetes, cancer, or morbid obesity.  Morbid obesity was one of the top five diagnoses the team would be asked to validate.

54.     The audit team would be directed to validate claims for a particular date of service.  The validation task for the first pass audit involved ensuring that all prerequisites were present for the billable diagnoses, including patient identifiers, a confirmed face-to-face visit, and the provider's signature and credentials.

55.     Most significantly, the first pass auditors were required to identify and validate the ICD-10 diagnosis code submitted for a patient.  The Aetna Coding Resource Guide substantiation rules provided that if the diagnosis appeared in specific portions of the chart known to be reliable (History of Present Illness, Patient Medical History, Physical Exam, Assessment, Plan, or embedded in the Medication List), then it did not need additional support.  However, the auditor would also review the rest of the chart to see if there was any conflicting documentation.  If there was no conflicting documentation, then the code was substantiated.  If there was conflicting documentation, then the auditor was required to find additional support in the chart for the diagnosis in order to validate the diagnosis code.

56.     The second pass auditor would undertake a similar review to determine if they agreed with the decision of the first pass auditor and state the reasons that supported the second pass auditor's decision.

57.     The third pass auditor team audited 20% of the work of the second pass auditors, using the same methods as the second pass auditors used to review the work of the first pass auditors.  The third pass auditors would also be involved in reviewing decisions where the first and second pass auditors disagreed.

58.     If the first and second pass auditors disagreed that a code had been validated, then both coders would write up their decision and how they came to it.  A "rebuttal" coder would then review both coders' submissions and decide which coder was correct, using the Aetna Coding Resource Guide as support for that decision.  If the coder whose decision was rejected still disagreed with the decision, they could escalate the issue to "manager review."

59.     Manager review involved review by three managers, which at the time Relator was employed at Aetna were initially Yasmin McLaughlin, Mari Orosa, and Melvin Seale.  When McLaughlin left Humana, Kim Loupe took her place in the manager review group.  The managers would review the conflicting decisions and make a

final determination as to whether the decision of the rebuttal coder would stand or would be overturned.

60.     Aetna coders were held to a 95% accuracy rate, and falling below that could result in discipline.  If a coder's decision was overturned, that would be counted against their accuracy rate.

61.     The audit team audited diagnosis codes from every region of the country, including the Eastern District of Pennsylvania.

## V.     ALLEGATIONS

### A.     Aetna Submitted to CMS Diagnosis Codes for Morbid Obesity That Were False, Inaccurate, or Otherwise Invalid, Causing Beneficiaries to Appear Sicker Than They Were and Increasing Their Risk Scores and CMS Payments to Aetna

62.     Commencing in or around 2019, Aetna implemented a uniform policy of submitting, or failing to delete, inaccurate, false, or otherwise invalid diagnosis codes for morbid obesity.  Aetna did so with actual knowledge of the falsity of the diagnosis codes or reckless disregard for or deliberate ignorance of the truth or falsity of the diagnosis codes, and these codes increased the payments CMS made for these beneficiaries.

63.     Specifically, in 2019, Aetna changed its policy from seeking to validate diagnoses of morbid obesity to directing coders to deliberately ignore information that would show the diagnoses of morbid obesity was not supported by the medical record and disciplining them when they failed to follow the new policy.

64.     Aetna's policy of deliberately ignoring information contradicting a diagnosis of morbid obesity applied to Aetna nationwide.  Relator and her team did retrospective audits of claims submitted for Aetna Plans nationwide and were not limited to any particular geographic region.

1. **Prior to 2019 Aetna Required Coders to Substantiate a Diagnosis of Morbid Obesity if BMI Was Less than 40**

65.    Each year Aetna issues guidance to all its coders for validating diagnoses submitted by providers.  The guidance has general rules that apply to review of all diagnoses, and specific rules that apply to particular diagnoses.

66.    The 2018 Aetna Medicare Coding Resource Guide ("2018 Guide") provided in the general rule section that coders should substantiate diagnosis codes where conflicting information appeared in the medical record.  2018 Guide; at 5 ("Coders will review the entire medical record for any contradictions such as 'copy & paste' from past visits, old services rendered etc.; as this results in misinterpretation of the patients' health condition.").

67.    The 2018 Guide also directed coders that if a condition appeared to be contradicted or not supported, they should apply "MEAT" to determine if the condition should be coded.  *Id.* at 5-6.  "MEAT" stands for Monitoring, Evaluating, Assessing, Treatment.  *Id.*  Applying MEAT means looking in the medical record for these components to substantiate the diagnosis.  *Id.*  The Guide also noted that depending upon where in the patient chart the condition is found (certain portions of the chart are deemed to be particularly reliable), "it may need substantiation confirming the condition is still present." *Id.* at 6.

68.    With respect to coding morbid obesity, the 2018 Guide specifically directed coders to look for substantiation in the medical record if the beneficiary's BMI was less than 40 and the provider included a diagnosis of morbid obesity:

> **4.    BMI**
>
>    a.  If the BMI is documented at or above 40.0, capture the appropriate ICD-9 code (V85.41 through V85.45) or ICD-10 code (Z68.41 through Z68.45). The BMI can be documented by nurses or other clinic staff and still be coded. (*AHA Coding Clinic 2Q 2010 – BMI*)
>
>    b.  If the BMI is 40+, but no mention of morbid obesity, you cannot code morbid obesity but you can capture the status code for the BMI.  Do NOT capture the diagnosis of "morbid obesity" based solely on the BMI. The provider's documentation must state "morbid obesity". (*AHA  Coding Clinic 4Q 2008 - Assigning Body Mass Index (BMI) Codes)*.
>
>    c.  The diagnosis of morbid obesity can be coded without a BMI noted.
>
>       • If the BMI is less than 40 and morbid obesity is diagnosed look for additional MEAT to support the condition.

2018 Guide, at 34 (highlight of relevant text added).

**2.    Starting in 2019 Aetna Directed Coders to Look Only One Way When Reviewing Diagnoses of Morbid Obesity**

        a.    Aetna's 2019 Coding Guide Removed the Directive to Substantiate a Diagnosis of Morbid Obesity if BMI was Less Than 40 and Aetna Coders Were Directed to Code Morbid Obesity *Regardless* of BMI

69.    Aetna's 2019 Coding Resource Guide ("2019 Guide") made several critical changes related to coding for morbid obesity.

70.    Most significantly, the 2019 Guide *deleted* the 2018 directions related to substantiation of morbid obesity diagnoses and replaced it with a short statement that morbid obesity could only be coded if the medical record included that diagnosis:

> **BMI**
> According to the ICD-10 official coding guidelines, the documentation of a BMI value can come from a clinician who is not the patient's provider.  However, the associated diagnosis (such as underweight, overweight, obesity or morbid obesity) must be documented by the patient's provider in order to code the associated diagnosis and never should be assumed.

2019 Guide, at 24.  Aetna's 2020 Coding Resource Guide ("2020 Guide") contained the same language but added that "Both height and weight need to be present in order to support the BMI."  2020 Guide, at 24.

71.    In addition, the 2019 general directions on substantiation also changed. Although the 2019 Guide still referenced applying MEAT and reviewing the medical record for contradictions, the 2019 Guide directed that if a diagnosis appeared to be contradicted or questioned by the provider documentation, the coder should query a senior coder or manager.  2019 Guide, at 8.  In other words, a coder or auditor could no longer invalidate a morbid obesity code they believed to be unsupported.  Instead, they were required to go through a burdensome, and as relator learned, fruitless process.

72.    Although the manual phrased the coding of morbid obesity as a limit on when the condition could be coded—only if the provider included that diagnosis—for several reasons, the 2019 Guide was understood to *require* coding of morbid obesity when it was not supported by the BMI indicated in the medical record.

73.    First, Aetna's Medicare Risk Adjustment Compliance team confirmed in a 2019 training powerpoint for coders on changes to the 2019 Guide that coders must ignore BMI below 40.  Specifically, the training powerpoint stated:

> MEAT is not required when the BMI is less than 40. Therefore we will code morbid obesity *regardless* of the BMI.

Aetna MRA Compliance, 2019 Coding Resource Guide:  Changes and Updates Highlights (1/16/29), at 22 (emphasis added).

74.    Second, a coder who invalidated a morbid obesity code when there was conflicting BMI information would have their decision reversed, which would count against their accuracy rating.  When the Relator commenced working for Aetna in early 2019, she followed her practice from prior experience as a coder and declined to code a patient with the diagnosis of morbid obesity because the medical record showed a BMI of less than 35, which was inconsistent with that diagnosis.  Her decision was rejected, and

she submitted a rebuttal, which she did only a handful of times in her career at Aetna. When her rebuttal was rejected, she felt so strongly that she was correct that she requested a manager review.  Although she did not receive a written response to her request, her supervisor, Yasmin McLaughlin, Manager of Medicare Risk Adjustment Compliance, told her on the phone that the Aetna Coding Resource Guide contradicted her decision and she needed to follow the guide and code morbid obesity if the provider gave that diagnosis, regardless of BMI.  Relator did what she was told because having a decision rejected would count against her accuracy rating.  If she fell below a 95% rating she could be placed on disciplinary status or possibly terminated.

75.    Other coders and auditors understood this issue the same way Relator did. When Relator later trained first pass coders and senior auditors, some of them would view the coding of morbid obesity the same way she initially had, but she would have to explain to them how Aetna handled it and that their decision would be rejected if they used conflicting BMI to question a diagnosis of morbid obesity.  Relator subsequently learned that other coders at Aetna had the same experience with being directed not to evaluate conflicting information with respect to morbid obesity.

76.    Third, although the substantiation rule provided that a coder should query a supervisor if the diagnosis was contradicted by the medical record, a coder had a disincentive to do so because that would delay completion of their required tasks.  Coders had a productivity requirement to complete a certain number of charts per day and to limit the number of unresolved charts.  A referral to a supervisor could delay review by several days and would reduce the auditor's production metrics.  Moreover, Relator was a senior coder, and she was unaware of any protocol for any coder to submit a query to her about a coding issue.  And as her experience showed, even if a coder could query a supervisor, the supervisor would direct the coder to follow the Aetna Coding Resource Guide, which was the ultimate authority, and the coder would be told to not consider BMI information that conflicted with a diagnosis of morbid obesity.

77.     Relator personally observed coders submitting the diagnosis code for morbid obesity as long as those words appeared in one of the areas of the medical record that the Aetna Coding Resource Guide deemed did not require additional MEAT and there was no other conflicting documentation that could be considered.

b.      <u>Aetna's 2019 Guide Was Updated to Provide that BMI of 40 or Greater Could be Used to *Substantiate* a Diagnosis of Morbid Obesity Where The Documentation Conflicted</u>

78.     Aetna issued updates to its Coding Resource Guide throughout the year, called "Coding Blasts."  In 2019, one Coding Blast clarified the requirements for validating a diagnosis of morbid obesity.  It provided that BMI *could* be considered to resolve conflicts in the direction of *supporting* a diagnosis of morbid obesity.

79.     Specifically, the 2019 Coding Blast stated that if there was a conflict in the documentation about morbid obesity—for example, if the patient chart stated both "obese" and "morbidly obese" —a BMI of 40 or greater could be used to *substantiate* the "morbidly obese" diagnosis.  In other words, under the 2019 Guide and update, coders could look at BMI to support a diagnosis of morbid obesity but could *not* look at BMI to consider whether such a diagnosis was invalid.

c.      <u>After 2019 Aetna Continued to Direct Coders to Validate a Diagnosis of Morbid Obesity *Regardless* of Conflicting BMI Information</u>

80.     Aetna had a "Training Team" that provided Coding Resource Guide materials to train its coders on uniform policies.  Kim Loupe was a senior manager who led this team after Relator's initial supervisor, Yasmin McLaughlin, left Aetna.  The Training Team produced a document called "Trending Topics" that would alert coders to particular recurring issues and direct them how to handle those issues.

81.     In 2021, Aetna issued a "Trending Topics" that addressed coding of morbid obesity.  That guidance directed coders to **"code morbid obesity when**

**documented regardless of BMI."** Trending Topics (1/22/21), at 8 (emphasis added).
Specifically, the guidance provided:

> - **BMI:** Documentation of BMI range only should not be coded. In order to code the BMI **the specific BMI value should be reported.**
>
>   - BMI should be coded when it is reported in the documentation.
>   - Per 4th qtr 2018 CC : While the BMI is used as a screening tool for patients who are overweight or obese, there is no coding rule that defines what BMI values correspond to obesity or morbid obesity, since the conditions are coded only when diagnosed and documented by the provider or another physician involved in the patient's care.
>   - MEAT is not required when the BMI is less than 40. Therefore, we will code morbid obesity when documented regardless of the BMI.
>
> **BMI**
> The documentation of a BMI value can come from a clinician who is not the patient's provider. However, the associated diagnosis (such as underweight, overweight, obesity or morbid obesity) must be documented by the patient's provider in order to code the associated diagnosis and never should be assumed. **Both height and weight need to be present in order to support the BMI.**
>
> **4 items are required to validate BMI:**
> **Documented by Provider OR Support staff**
> 1. BMI value (not range)
> 2. Height
> 3. Weight
> **Documented by Provider Only:**
> 4. Associated diagnosis (such as underweight, overweight, obesity or morbid obesity)

Trending Topics, at 8 (highlight of relevant language added).

      82.    This directive was consistent with the 2019 training materials and with what the Relator had been instructed to do in 2019 when she began working for Aetna.

      83.    Because the diagnosis of "morbid obesity" could appear in the areas listed in the Aetna Coding Resource Guide on substantiation, including medical history, the diagnosis of morbid obesity would be validated even if there was no current support for the diagnosis of morbid obesity and even if the BMI indicated the person was no longer morbidly obese.

      84.    In summary, Aetna's policy evolved from requiring substantiation of morbid obesity to directing auditors to not look at conflicting BMI information, resulting in the false attestation of accuracy of claims submitted to CMS, failure to delete false codes, and failure to return overpayments.

**B.**    **Defendants Acted Knowingly**

85.    A defendant acts knowingly under the FCA if it acts with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).

86.    By expressly directing coders to ignore conflicting BMI information in the medical record, and by reprimanding coders who did not abide by this directive, Aetna knowingly submitted, or at a minimum deliberately ignored or recklessly disregarded, that it was submitting false, inaccurate, or otherwise invalid diagnosis codes for morbid obesity.  As a result, the risk scores for individuals who were not morbidly obese were inflated, causing CMS to overpay Aetna for the care of those individuals.

87.    MA Organizations are required to have a compliance program that is intended to capture and correct invalid diagnosis codes, 42 C.F.R. § 422.503(b)(4)(vi), but Aetna's policy prevented the identification and correction of invalid diagnosis codes.

88.    Aetna had an obligation to delete invalid codes and to return overpayments based on invalid diagnosis codes. 42 C.F.R. § 422.326.  Instead, Aetna knowingly and improperly avoided its obligation by directing its coders to deliberately ignore BMI information that showed the diagnosis was not supported by the medical record, while directing them to use BMI to substantiate morbid obesity where that diagnosis conflicted with another diagnosis.

**C.**    **The Misrepresentations Were Material**

89.    A misrepresentation is material under the FCA if it has a natural tendency to influence or is capable of influencing the government's payment.  31 U.S.C. § 3729(b)(4).

90.    As a condition of payment under Part C and Aetna's contracts with CMS, it was required to attest to the accuracy, completeness, and truthfulness of the data submitted for payment.  42 C.F.R. § 422.504(*l*).  Both the truthfulness of the data and the attestations are statements and records material to Aetna's claims for payment.  The

attestations and the data are material to payment because the government would not pay the claims if it knew that the attestations and data were false.

91.    The truthfulness of diagnosis codes and data is central to the bargain under Part C and is not minor or insubstantial because it directly affects the amount the government pays.  42 C.F.R. § 422.504(*l*); Medicare Managed Care Manual, Chapter 7, at 120.2.3 (diagnosis codes drive the risk scores, which drive risk adjustment payments from CMS to MA Organizations).

92.    If the government had been aware that the diagnoses of morbid obesity were false, inaccurate, or otherwise invalid, the government would not have paid Aetna for the claims.  The Department of Justice has made it a priority to pursue "plans and healthcare providers that manipulated the risk adjustment process by submitting unsupported diagnosis codes to make their patients appear sicker than they actually were."  https://www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year (discussing settlements and pending cases); *see also, e.g.*, https://www.justice.gov/opa/pr/martins-point-health-care-inc-pay-22485000-resolve-false-claims-act-allegations.  In particular, the government has enforced the requirement that the diagnosis of morbid obesity be truthful and accurate.  *See* https://www.justice.gov/opa/pr/cigna-group-pay-172-million-resolve-false-claims-act-allegations.

## VI.    CAUSES OF ACTION

### Count I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

93.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 92 above as though fully set forth herein.

94.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

95.     Defendants have knowingly presented or caused the presentation of false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

96.     The United States, unaware of the falsity of the claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

97.     Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

98.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### Count II
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

99.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 92 above as though fully set forth herein.

100.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

101.    Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

102.    The United States, unaware of the falsity of the statements or records that Defendants made, used, or caused to be made or used, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

103.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

104.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## Count III
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)(G)

105.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 92 above as though fully set forth herein.

106.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

107.     Defendants have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

108.     The United States was unaware of the falsity of the statements or records that Defendants made, used, or caused to be made or used material to an obligation to pay money to the United States or the avoidance or concealment of an obligation to return overpayments.

109.     Defendants damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

110.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3729*, et seq.*;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum civil penalty permitted for each violation of the Federal False Claims Act;

3.      That Plaintiff-Relator be awarded the maximum share amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

4.      That Plaintiff-Relator be awarded all fees, costs, and expenses incurred in connection with this action, including attorneys' fees, costs, and expenses; and

5.      That Plaintiff-Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.


Dated:  January 24, 2024                  Respectfully submitted,


Jeffrey W. Dickstein, *pro hac vice to be submitted*
PHILLIPS & COHEN LLP
P.O. Box 398508
Miami Beach, FL 33239-8508
Tel:  (305) 372-5200
jdickstein@phillipsandcohen.com

Amy L. Easton, *pro hac vice to be submitted*
PHILLIPS & COHEN LLP
2000 Massachusetts Ave.
Washington, DC 20036
(202) 833-4567
aeaston@phillipsandcohen.com

Claire M. Sylvia, *pro hac vice to be submitted*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
(415) 836-9600
csylvia@phillipsandcohen.com


By:

John T. Crutchlow
YOUMAN & CAPUTO LLC

Two Logan Square
100-120 N. 18th Street, Suite 1925
Philadelphia, PA 19103
jcrutchlow@youmancaputo.com

Counsel for Plaintiff-Relator

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| UNITED STATES EX REL. MARY MELETTE THOMAS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AETNA, INC., ET AL | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.        ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)        (x )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        ( )

| | | |
|---|---|---|
| January 24, 2024 | _John Crutchlow_ | Plaintiff-Relator |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-302-1999 | 610-808-1772 | jcrutchlow@youmancaputo.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____  _____  _____
                        *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**   *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
     *(Please specify): _____*

**B.**   *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify): _____*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
     *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____  _____  _____
                        *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)